## DECLARATION OF JASON M. WRIGHT IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, **Jason M. Wright**, submit this declaration based upon my personal knowledge. If called upon to testify, I can and will testify truthfully and accurately to the facts contained herein.

1. I am a person with disabilities pursuant to the Americans with Disabilities Act (ADA) and Section 504 of the Rehabilitation Act of 1973 and have been recognized as such by virtue of being issued formal written accommodations by the University of Denver (DU), Disability Services Program (2019-2020). – Exhibit **C** (DU, Disability Services Program, 2019-2020 Letter of Approved Accommodations [LOAAs]) and *Exhibit AB* (DU transcript, 2019-2020).

2. My relevant diagnosed disabilities for which I sought and was denied accommodations by Defendant National Board of Medical Examiners (NBME) are Attention Deficit/Hyperactivity Disorder (ADHD), Inattentive Type (DSM-5 [ICD-10] 314.00 [F90.0]), and Specific Learning Disorder (SLD), with Impairment in Reading (deficits in *reading fluency/rate* and *reading comprehension*) (DSM-5 [ICD-10] 315.00 [F81.0]).

3. I have been administered two psychoeducational/neuropsychological evaluations (2017 and 2020), both by Terri Lucero, Ph.D., licensed clinical psychologist. Annexed hereto and supporting this Declaration and Plaintiffs Motion for Preliminary Injunction are the following reports from Terri Lucero, Ph.D., licensed clinical psychologist.

- Exhibit **A**: 2017 Psychoeducational Evaluation (Evaluation Dates: 9/28, 10/3, 10/5, & 10/12 /2017).

- Exhibit **B**: 2020 Neuropsychological Evaluation (Evaluation Dates: 10/27, 10/29, & 11/4 /2020).

4.      My evaluator, Terri Lucero, Ph.D., as a licensed clinical psychologist, is considered a *Qualified Professional* to administer such assessments and possesses expertise in the disabilities for which I sought and have been denied accommodations by Defendant NBME. Please note the content under the following section header in Exhibit **D** (USDOJ, ADA Requirements, Testing Accommodations), which I used as a resource when preparing the submitted documentation that accompanied my official requests to Defendant NBME for testing accommodations on the USMLE Step 3:

- **What Kind Of Documentation Is Sufficient To Support A Request For Testing Accommodations?**
  - "***Qualified Professionals.*** *Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations. Qualified professionals are licensed or otherwise properly credentialed and possess expertise in the disability for which modifications or accommodations are sought. Candidates who submit documentation (such as reports, evaluations, or letters) that is based on careful consideration of the candidate by a qualified professional should not be required by testing entities to submit additional documentation. A testing entity should generally accept such documentation and provide the recommended testing accommodation without further inquiry.*"
    - "*Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of*

*the candidate for diagnosis and treatment. This is especially important for individuals with learning disabilities because face-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate testing accommodations.*"

- "*A qualified professional's decision not to provide results from a specific test or evaluation instrument should not preclude approval of a request for testing accommodations where the documentation provided by the candidate, in its entirety, demonstrates that the candidate has a disability and needs a requested testing accommodation. For example, if a candidate submits documentation from a qualified professional that demonstrates a consistent history of a reading disorder diagnosis and that recommends the candidate receive double time on standardized exams based on a personal evaluation of the candidate, a testing entity should provide the candidate with double time. This is true even if the qualified professional does not include every test or subtest score preferred by the testing entity in the psychoeducational or neuropsychological report.*"

5.    In addition, my relevant diagnosed disabilities (i.e., ADHD [Inattentive Type]; SLD, with Impairment in Reading [deficits in *reading fluency/rate* and *reading comprehension*]) for which I sought and have been denied accommodations by Defendant NBME impair my major life activities of learning, reading, and concentrating.

6.      Further, I strongly believe that my long and documented history of atypical, poor, and/or failing standardized assessment/examination performances is overwhelmingly most reflective of a lifetime of me possessing the relevant and now diagnosed disabilities for which I sought and have been denied accommodations by Defendant NBME, as well as when the associated impairments of my major life activities of learning, reading, and concentrating are evinced the most, by far. This same long and documented history of atypical, poor, and/or failing standardized assessment/examination performances is also the cause for all of the most psychologically, emotionally, and financially damaging consequences that I have had to incur with repetition over most of my life.

7.      When added to the findings from my two neuropsychological/psychoeducational evaluations, I feel as though the Defendant NBME has been provided with more than enough documented evidence, and certainly more than is required, to prove that my major life activities of learning, reading, and concentrating are, and have always been, impaired and caused by my now identified and diagnosed disabilities.

8.      Of more importance is that my long and documented history of poor and/or failing performances on multiple high stakes standardized examinations also shows the highly consequential outcomes of **a)** not appropriately identifying and diagnosing the disabilities for which I sought and have been denied accommodations by Defendant NBME (i.e., ADHD [Inattentive Type]; SLD, Impairment in Reading [deficits in *reading fluency/rate* and *reading comprehension*]) in primary/secondary school, as well as **b)** from allowing for and often incentivizing testing entities such as the Defendant NBME to violate the ADA rights of individuals like myself openly and continuously.

9. Further, both of my neuropsychological/psychoeducational evaluations (2017 and 2020) were performed in-person and in a clinical setting. Each of these two neuropsychological evaluations required from 3–4 separate testing sessions, with each session lasting several hours. Please note the content under the following section header in Exhibit **D**:

- **What Kind Of Documentation Is Sufficient To Support A Request For Testing Accommodations?**

  - "*Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment. This is especially important for individuals with learning disabilities because face-to-face interaction is a critical component of an accurate evaluation, diagnosis, and determination of appropriate testing accommodations*".

10. Even though I was not identified and diagnosed with either of the relevant diagnosed disabilities, for which I sought and have been denied accommodations by Defendant NBME, until I was an adult (i.e., ADHD [Inattentive Type]; SLD, Impairment in Reading [deficits in *reading fluency/rate* and *reading comprehension*]), I do have a long and documented history of atypical, poor, and/or failing standardized assessment/examination performances, dating from pre-school through the present, that have been extensively evaluated, explained to me for my understanding, and reported in Exhibit **B** as follows:

"*Mr. Wright has had longstanding trouble with focus and concentration, although ADHD was not formally diagnosed until he was an adult. A psychiatrist diagnosed ADHD in 2011… However, records provided to the examiner revealed early symptoms*

*suggestive of ADHD, even on a preschool evaluation conducted when he was five-years-old… In addition records from the results of the Iowa Tests of Basic Skills and other standardized academic tests, from 4th through 11th grade, revealed a lot of variability in his performance. This type of inconsistency is common among students with ADHD*."

11.     It is my strong opinion that the explanation above, and the more in-depth explanations as reported about me in Exhibits **A** and **B**, are the most logical and accurate for my long and documented history of atypical, poor, and/or failing standardized assessment/examination performances. It is also the explanation that I overwhelmingly believe best puts the most easily understandable and precisely worded description of my multiple associated negative examination experiences and consequences, as well as the psychological and emotional damage caused from a lifetime of related feelings of embarrassment, shame, and frustration. These have all occurred with great frequency during my decades of poor scoring and/or failing standardized examination performances, and as a result of my now diagnosed relevant disabilities not being appropriately identified and diagnosed in early childhood and/or primary school; not because I did not have these relevant disabilities back then, but because the education system failed to appropriately identify my documented and long history of atypical academic achievement and standardized examination performances as representing a need for an assessment that would have identified and diagnosed the very disabilities I have now been formally identified and clinically diagnosed as having (i.e., ADHD [Inattentive Type]; SLD, with Impairment in Reading [deficits in *reading fluency/rate* and *reading comprehension*]).

12.     As an underrepresented minority in medicine (URMM) and biracial individual (i.e., Black [African American] and White [Caucasian]), my family voluntarily chose to take part in the Colorado public school desegregation program through Denver Public Schools (DPS). I

specifically did so by attending Bromwell Elementary School in the Cherry Creek neighborhood from grades 1 – 5 (1983–1988).

13.      Even though I was able to perform well academically throughout my five years of elementary school, I do recall feeling a seemingly stronger than normal dislike for reading, highly preferring to learn through other visual, auditory, or "hands-on" methods, when available. This has always been strongly associated with the rather embarrassing feelings of knowing I am a significantly slower reader than most. While much too young in primary school to comprehend these feelings as anything other than sheer embarrassment, I tried my best and in many creative ways to hide the fact for as long as I could. I recall at least two strategies I would use for doing so in primary school:

  **a.)** There were times when the class would be instructed to read a short passage silently and then raise our hands when we were finished. This was often followed by randomly calling on students to answer questions about the passage posed by the teacher. In an effort to minimize any embarrassment from my felt deficits in reading fluency/rate and comprehension, one compensatory mechanism I would try to use was to only skim through the assigned passages while trying to appear to be reading them in full. I would make sure to also watch for the raising hands of other students so I could signal I had finished reading in-line with the completion times of the other students who I felt were performing at approximately the same high level as I.

  **b.)** Another mechanism I recall using when these feelings would arise from being asked to read a passage/paragraph aloud to the class was to try and figure out the order/pattern in which each student would have to read, use that pattern to figure

out when and what I would have to read, and then go to that section and read my part silently as many times as I could before being called on to do so aloud. Once called upon, I was then usually able to mimic the reading fluency of the other students as though I too did not have trouble with reading. It is important to note that I was not doing this as a sign that I knew I had a disability back then, but because I was a child trying to hide from the associated feelings of embarrassment that my now diagnosed SLD, with Impairment in Reading (deficits in reading fluency/rate and reading comprehension) was causing.

14.     I further now understand that these early childhood compensatory/masking mechanisms are common in individuals identified as Twice-exceptional (2e) and make it more difficult to identify a need for assessment and/or academic interventions. This identification was the other significant assessment finding reported in both Exhibits **A** and **B**, and is specifically described in Exhibit **B** in the following way:

- "*It is essential that Mr. Wright's performance is evaluated within the context of his advanced intellectual/ reasoning abilities. His patterns of performance are consistent with those of individuals who are Twice-Exceptional (2e) — with gifted intellectual abilities in addition to underlying learning differences. These 2e individuals can often use strong reasoning skills to compensate (at least partially) for symptoms of learning differences and ADHD, especially in primary and secondary school (Webb et al, 2016). It is not uncommon for 2e individuals to perform well, or at least 'average' in school and on exams in comparison to their peers, and for their learning differences AND their gifted abilities to be 'masked.' Yet this often comes at a high cost to the individual, both emotionally and*

8

*cognitively, as 2e individuals generally have to expend substantial effort, often significantly more time than their 'intellectual peers,' in order to achieve academic 'success,' which is often lower than their aptitude.*"

- "*Individuals with learning disabilities, and especially those who also have advanced intellectual abilities like Mr. Wright, are often caught in a bind. If they do 'well' (i.e., performance in the average range, or above, compared with peers) then they are not seen as having a learning difference, and if they fail at some other task then they are simply seen as not having put forth enough effort. Unfortunately, many professionals — both in the field of education and in the field of psychology — do not receive training regarding the unique characteristics of gifted and twice-exceptional individuals, thus these unique learners are often missed entirely throughout their academic careers and their lives. This explains why Mr. Wright has not previously received accommodations*".

15.    Most notable from high school (Denver East High School, 1991-1995), when increasing academic demands included larger and more complex reading assignments, was the fact that my formerly effective compensatory/"masking" mechanisms for my still unidentified disabilities (i.e., ADHD [Inattentive Type]; SLD with Impairment in Reading [deficits in *reading fluency/rate* and reading comprehension]) I feel became less effective over the course of those four years (grades 9-12); however, I continued to show the same variabilities in standardized testing performance that was seen on review of assessments from primary school, including my much lower-than-expected scores on grade-level standardized assessments and college entrance examinations (1994/1995).

16.     It truly was not until taking and receiving my initial set of SAT and ACT scores that I first began to comprehend the damaging effect the disassociation between my academic achievements and standardized examination performances could have on my dreams of becoming a physician. However, the only "guidance" I recall provided to both my parents and I, which I believe came from my high school guidance counselor – unfortunately, not uncommon to what I have heard, read, and has been reported by multiple other Black former students like myself about similar experiences concerning school-assisted student guidance with post-secondary school life plans and career directions at that time (i.e., ~1994/1995) – was to the effect that I *just needed to put forth more effort towards studying for retaking the college entrance examinations*. I further recall this explanation seeming rather non-specific and inadequate (at best), and highly inaccurate, embarrassing, frustrating, and discouraging (at worst) to me personally, especially given my otherwise high academic achievements and the known number of extra hours and effort I had already put into studying for my initial attempts on the SAT and ACT college entrance examinations. I ended up studying for and taking the SAT four separate times, and the ACT two separate times, both showing minimal improvements (if any) with each successive attempt. – Exhibits **E** (SAT score reports [x4]) and **F** (ACT score reports [x2]).

17.     Nonetheless, I was still able to do well academically, passing all of my high school courses on the first attempt, including all required courses to apply to most 4-year undergraduate colleges and universities in the U.S. I graduated high school on-time with my entering class, earning a GPA of ~3.0.

18.     Due to the combination of my strong academic and extracurricular achievements but much lower-than-expected scores on six combined unaccommodated attempts at the SAT

and ACT college entrance examinations, I was excited to be accepted and matriculate into the Fall 1995 freshman class at the University of Colorado at Boulder; however, I was admitted under academic probation, in large part because of my low SAT and ACT scores.

19.     After graduating why my B.A. in Psychology with a minor in Chemistry, and while working, I continued taking courses to improve on and complete my premedical education course requirements and began preparing to sit for the required medical college admissions test (MCAT), both necessary to apply for admission consideration to U.S. medical schools at that time.

20.     I sat for the MCAT twice (2004 and 2005); however, even with the additional preparation and expense of an in-person MCAT preparation course administered by a well-established and highly credible private examination preparation company, plus extra private 1:1 tutoring from one of the course instructors, I continued to struggle on scoring poorly on the provided and proctored practice examinations, and scored much too low on both of my MCAT attempts (2004 and 2005) to gain admission to a U.S. medical school after applying to almost all using the American Medical College Application Service (AMCAS) on I believe a cumulative three separate occasions (for entering classes 2005, 2006, and 2008). Notably, the negative consequences associated with my multiple poor and/or failing performances on required high-stakes, time-limited standardized examinations without accommodations has delayed my career as a licensed physician for so long now that both of my MCAT attempts (2004 and 2005) were still only offered using actual pencils and paper. – Exhibit **G** (MCAT score report [2005]; MCAT scores [x2; 2004 and 2005] and GRE score [x1; 2006] as reported on AMCAS Application Report – 2008 Entering Class [report date of 11/01/2007]).

21.     Following my two poor MCAT performances and understanding the large negative effect they had on my inability to gain U.S. medical school admission, I attempted to increase my chances for gaining medical school admission by enrolling in a public health graduate degree (MPH) program at the University of Colorado, Anschutz Medical Campus (2006-2008).

22.     When I applied to medical schools for admission a third time in 2008, I included Ross University School of Medicine (RUSM). While I once again failed to gain admission to any U.S. medical schools that year, I was accepted into RUSM, albeit on a conditional bases due to my low MCAT scores. The condition was I had to first take and pass a university provided medical education review program (MERP) in Florida. This conditional program lasted for ~15-weeks in Spring/Summer of 2009. Passing this program was based on individual student performance on a comprehensive final examination, with a predetermined cutoff percentage of questions answered correctly (I believe it was set at $\geq 70$-75%) as a threshold. Notification of test results were provided to examinees as a PASS/FAIL report only. I received a PASS and was therefore officially admitted to the RUSM Fall 2009 entering class.

23.     I performed well in my first 2-years of medical school, finding ways to pass all required courses on my first attempt. However, the extremely heavy basic sciences course load demanded much more reading than any of my previous academic programs, which I believe is best reflected in my average basic sciences GPA (i.e., first 2-years of medical school). I also performed well on the multiple course topic and cumulative examinations at RUSM, which were given using many different methods of assessment.

24.     One graduation requirement for RUSM was to pass both the USMLE Step 1 and USMLE Step 2 examinations (Step 2 CK and CS).

12

25.     In addition, completion of the USMLE series is a requirement for U.S. medical licensure. Individual U.S. state medical boards determine their own number of examination attempts allowed per each USMLE Step in the series, as well as whether or not the examination series must be passed within a predetermined timeframe (e.g., within 7 years from first attempt on USMLE Step 1). Because of the ongoing and extended delay to the progression in completing my residency training required for physician licensure and a career, caused by both my termination from residency for failing USMLE Step 3 and the Defendant NBME's two denials of my requested accommodations on USMLE Step 3, my opportunities to fulfill state criteria for licensure on-time are increasingly limited. For example, see the Federation of State Medical Boards' (FSMBs) website showing the varying timeframes for meeting the examination requirements for medical licensure in each State. – **Source** (https://www.fsmb.org/step-3/state-licensure/).

26.     I first began to proactively seek formal explanations and assistance for my lifelong (yet now with much higher-stakes, i.e., much more financially, employability, and emotionally consequential), time-limited standardized examination struggles in 2011, when I found myself struggling once again to prepare for another high-stakes, time-limited standardized examination (USMLE Step 1). I used several examination preparation study strategies while preparing for this examination including two subscriptions to USMLE Step 1 style question banks, and one USMLE Step 1 content review course.

27.     Further, my medical school required students who completed their basic sciences coursework to sit for and pass a school-provided and proctored Comparative Step 1 examination prior to being given approval to register and sit for the actual USMLE Step 1 examination. In addition, per school policy, eligible students were only allowed three attempts to pass the

Comparative Step 1 examination. Those who remained unsuccessful after a third attempt were effectively dismissed from RUSM at that time. The Comparative Step 1 examination was given in-person and using pencil and paper, and at least for me under the exact standardized unaccommodated USMLE Step 1 time-limited conditions. After failing my first two attempts at the Comparative Step 1 examination (January 2011 and May 2011, both without accommodations), I received notice that I passed my third attempt (~August-September 2011, without accommodations).

28.     Following, I immediately registered for the USMLE Step 1 examination and passed on my first attempt without accommodations on November 9, 2011.

29.     Even though my excitement from passing the USMLE Step 1 on my first attempt did not allow me to reflect on this now noticeable pattern, it should be noted that it took me a combined 4 attempts to pass 2 high-stakes time-limited standardized examinations of USMLE Step 1 tested content and in USMLE Step 1 or similar passage-based and single-best-answer MCQ format, over a ~10-month period from January 2011 to November 9, 2011. – Exhibit **H** (USMLE Step 1 score report):

1)  ~January 2011: ***failed*** 1st Comparative Step 1 examination attempt w/o accommodations.

2)  ~May 2011: ***failed*** 2nd Comparative Step 1 examination attempt w/o accommodations.

3)  ~September 2011: ***passed*** 3rd and final Comparative Step 1 examination attempt.

4)  November 9, 2011: ***passed*** 1st USMLE Step 1 attempt w/o accommodations.

30.     Passing the USMLE Step 1 effectively ended the hold on me starting 3rd and 4th years of medical school clinical rotations, which I began in ~January 2012.

31.     I continued to excel during 3rd and 4th years of core and elective clinical rotations, completing many rotations alongside U.S. medical students at highly respected medical institutions and academic centers (e.g., Cleveland Clinic, NYU, Denver Health, Jamaica Medical Center, and the University of Miami).

32.     However, my testing struggles also continued with the next USMLE Step in the series; Step 2 Clinical Knowledge (CK). I failed this required examination on my first attempt without accommodations on July 13, 2013. I used the same strategies to study for my first attempt on the required USMLE Step 2 CK that I used to eventually pass the Comparative Step 1 examination on my third and final attempt, and then for passing my first attempt at the USMLE Step 1. – Exhibit I (NBME account screenshot, all USMLE attempts).

33.     Notably, I did pass the USMLE Step 2 Clinical Skills (CS) on my first attempt, which was a separate assessment of the clinical application of Step 2 level clinical knowledge. – Exhibit J (March 2013 – USMLE Step 2CS score report).

34.     Fortunately, I was able to pass the USMLE Step 2CK on my second attempt without accommodations on November 1, 2013, albeit with yet another lower-than-expected score, especially for what is typical when compared with scores on USMLE Step 1. – Exhibit K (November 2013 – USMLE Step 2CK score report).

35.     I completed all medical school coursework, clinical rotations, and examination requirements to obtain my medical doctorate (M.D.) degree in January 2014, and officially graduated from RUSM on March 31, 2014, in good standing. – Exhibits L (RUSM transcript) and M (MSPE).

36.     On my first residency application in the Fall of 2013, I decided to pay the additional expenses required to apply to a larger than average number of residency programs

using the electronic residency application service (ERAS).  My primary reason for doing so was due to the negative impact I knew my two poor performances on the USMLE Step 2 CK without accommodations were going to have on my chances of being selected for interviews with residency programs. This is evident by the fact that many residency programs still have eligibility criteria for applying to their programs limited to only applicants who have never failed any USMLE Step attempt prior to applying. True to my belief, even though I applied to >100 residency programs that year, I was only offered interviews with approximately three of them. Two of these interviews were for nondesignated transitional post-graduate year 1 (PGY-1) positions (i.e., one-year contract vs. categorical residency positions which match high-ranked applicants for the entire duration of the residency program). In the March 2014 national residency match program (NRMP), I was still happy to match into a 1-year general surgery first-year position (i.e., nondesignated transitional PGY-1 resident), which I completed from July 1, 2014, to June 30, 2015, in good standing. However, I was forced to take a year off after applying but failing to match into another residency program for the 2015/2016 year (i.e., did not match in March 2015 using the NRMP). – Exhibits **N** (2014 NRMP match letter – PGY-1) and **O** ( PGY-1 completion letter).

37.     During my year off, I reapplied to the 2016-2017 match for a costly third time, once again receiving, attending, and ranking three programs that year. One of these was the Physical Medicine & Rehabilitation (PM&R) residency program through Wayne State University School of Medicine (WSUSOM), hosted by Beaumont Hospital-Taylor, in Taylor, Michigan.  During my interview for one of four PGY-1 categorical positions in this program (i.e., PGY-1 through PGY-4), it was announced there was also one PGY-2 categorical position (i.e., PGY-2 through PGY-4) being offered since the program had been approved funding for an

additional resident.  Those of us interviewees who had already completed a PGY-1 were told to express our interest if we wanted to be considered for this categorical PGY-2 through PGY-4 position as well, which I did since this position would still begin on July 1, 2016, and mean I would not need to repeat another PGY-1. As was allowed when applying to residency programs through the Fall 2015 ERAS and as directed to do by the residency program administration, I added this PGY-2 position to my application for consideration, effectively showing I wanted to be considered for both the PGY-1 and the PGY-2 categorical positions that would begin on July 1, 2016.

38.     The NRMP match day in March of 2016 revealed I had in fact matched into the PGY-2 position in the PM&R residency program at Wayne State University School of Medicine (WSUSOM).  Therefore, come July 1, 2016, I joined a class of four other residents who all began together as categorical PGY-1 residents (i.e., PGY-1 through PGY-4) in the program the previous year. – Exhibit **P** (2016 NRMP match letter – PGY-2).

39.     On April 10, 2017, I sat for and failed the USMLE Step 3 exam on my first attempt without accommodations. Following, I was notified by my residency program and WSUSOM GME that I would be allowed to complete my PGY-2, with further actions decided over the interim weeks.  The final decision made by the Wayne State University School of Medicine (WSUSOM) Graduate Medical Education (GME) administration, and the PM&R residency program administration was, after completing my PGY-2 I would be required to take up to a 6-month unpaid leave of absence (LOA) from the program and submit a passing score on the USMLE Step 3 no later than December 31, 2017, or "*risk being terminated from the program*." – Exhibit **AC** (April 2017 – USMLE Step 3 score report).

40.     A few months into my unpaid LOA, and once again with much less than the required improvements to unaccommodated practice assessment required to pass my second USMLE Step 3 attempt without accommodations, I decided that, even though I had no idea as to why, there must be something wrong and/or different about the way I learn and/or process information, and related to my lifelong embarrassing experiences of reading slower than most, that was causing me to be on the verge of being terminated from a residency program, for no other reason than failing yet another high stakes standardized examination (i.e., USMLE Step 3) without accommodations. I knew it was not related to my clinical application of USMLE Step 3 level knowledge since I was performing well and meeting or exceeding all program and GME expectations related to the clinical application of the very same USMLE Step 3 clinical knowledge, as I always had done previously during my medical school clinical rotations and in my PGY-1. Therefore, I first decided, without any advice, guidance, or support from the Wayne State University School of Medicine (WSUSOM) Graduate Medical Education (GME) administration, or the PM&R residency program administration, to search for a qualified professional to formally assess me using neuropsychological/psychoeducational evaluation for any and/or all other potential and relevant causes other than my already previously diagnosed ADHD (Inattentive Type) that could be related to my many lifetime of poor and/or failing performances on multiple high stakes standardized examinations without accommodations. Of note, when formally diagnosed with ADHD (Inattentive Type) in 2011 by a licensed Psychiatrist, the diagnosis was based solely on a clinical interview during which I verbally explained my standardized examination history and ongoing struggles with these kinds of assessments. In addition to being formally identified and diagnosed with ADHD (Inattentive Type) by this licensed and *Qualified Professional*, the accommodation provided me for the described

impairment to my major activity of concentrating was in the form of an appropriate initial

prescription medication for individuals being adequately identified and receiving a diagnosis of

ADHD for the first time.

41.     I received my initial psychoeducational evaluation in Fall 2017 while on my

unpaid LOA, as previously described and as reported in Exhibit **A**.

42.     I immediately informed my residency program director, Johnathon Ho, M.D., via

telephone call about my neuropsychological/psychoeducational assessment results, only days

following my October 31, 2017, feedback session with my evaluator, Terri Lucero, Ph.D. (i.e.,

~November 1–7, 2017).

43.     I also informed Johnathon Ho, M.D., of the Defendant NBME's required *at least*

*60 business days for processing* requests for testing accommodation USMLE Steps, as I had seen

on the related USMLE website and on the instructions page of the required USMLE Request for

Testing Accommodations form. I further explained how this would mean that the NBME's

decision to any request for testing accommodations would be received after the program's

deadline of December 31, 2017, for me to pass this examination.

44.     With a lack of residency program and graduate medical education (GME)

administrative direction and/or support felt required for the situation, and given my still highly

confused and limited understanding for how to handle situations concerning accommodations for

my newly identified and diagnosed disability (i.e., SLD, with Impairment in Reading [deficits in

*reading fluency/rate* and *reading comprehension*]), I truly felt as though this combination of

confusion and extremely sensitive circumstances left me with only one option, which was to

keep my already scheduled USMLE Step 3 retake test date on November 29, 2017.

45.     Once again, I sat for my second attempt at USMLE Step 3 without accommodations, which was once again followed by receipt of my second failing score report on the USMLE Step 3. – *Exhibit AD* (November 2017 – USMLE Step 3 score report).

46.     On or about December 29, 2017, but before December 31, 2017, I submitted a copy of my 2017 psychoeducational evaluation report to Johnathan Ho, M.D., via an email with the document attached. This sensitive information included my identified and diagnosed ADA recognized disabilities and recommendations for testing accommodations.

47.     Even though I was otherwise performing well, completing my post-graduate year 2 (PGY-2) in good standing and meeting or exceeding all other program expectations and requirements, the only reply I received to this email and provided official documentation, arrived by postal carrier on January 10, 2018. This reply from my program director, Johnathan Ho, M.D., was in the form of a Termination Letter, signed and dated by him, January 5, 2018. – Exhibit **Q** (WSUSOM, PM&R residency program Termination Letter).

48.     I appealed my termination and attended an appeal hearing back on WSUSOM's Detroit, MI campus, on March 6, 2017.  However, WSUSOM's decision to terminate my employment remained unchanged, based solely on my failed attempts on the USMLE Step 3 without accommodations.

49.     Following my termination from residency training at Wayne State University School of Medicine in Michigan (WSUSOM), and by my former residency program director, Johnathan Ho, M.D., for failing "*to achieve a passing grade on the Step 3 examination by December 31, 2017*", I returned home to Denver, CO and immediately began studying to take the USMLE Step 3 again, this time with the assistance of a private tutor. I met with my private tutor weekly for 1-hour per session and did so for ~50 consecutive sessions (i.e., minus holidays and

~1-4 cancellations; at $40 per hour, calculated total spent = $1,950). My tutor primarily assisted me with formulating multiple relaxation, focus, time-management and organizational, studying, and test taking strategies. Testing strategies were practiced and applied in conjunction with an extremely well-known and high-quality USMLE Step 3 online subscription for examination preparation. This subscription, equivalent or similar to those I subscribed to from one of the same companies I used in preparation for the USMLE Steps 1 and 2CK, included a large USMLE Step 3 passage-based MCQ style question bank, a USMLE Step 3 CCS style question bank and software simulator, a Biostatitics for the USMLE Step 3 learning module, and two USMLE Step 3 passage-based MCQ style self-assessments.

50.     Even though I already knew that I was going to submit a request to the NBME for testing accommodations on my eventual third attempt on the USMLE Step 3, and even though I truly believed that I both needed and would be approved for those requested accommodations, my tutor and I decided I should practice questions under standardized time-limited conditions given any chance the NBME may deny my request.

51.     On or about September 28, 2018, I submitted an official request to the NBME for testing accommodations on the USMLE Step 3. I provided the NBME with all required and requested documentation, which included my 2017 Psychoeducational Evaluation report prepared by Terri Lucero, Ph.D., a personal statement, and a completed USMLE Request for Test Accommodations form. This documentation demonstrated that a qualified professional evaluated me prior to this request, and recommended testing accommodations, including extended time (time-and-a-half to double time) on all exams/tests – Exhibit R (2018 USMLE Request for Testing Accommodations). Please note the content under the following section headers in Exhibit D:

- **What Kind Of Documentation Is Sufficient To Support A Request For Testing Accommodations?**

  - "***First Time Requests or Informal Classroom Testing Accommodations.*** *An absence of previous formal testing accommodations does not preclude a candidate from receiving testing accommodations*."

  - "***Qualified Professionals.*** *Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations. Qualified professionals are licensed or otherwise properly credentialed and possess expertise in the disability for which modifications or accommodations are sought. Candidates who submit documentation (such as reports, evaluations, or letters) that is based on careful consideration of the candidate by a qualified professional should not be required by testing entities to submit additional documentation. A testing entity should generally accept such documentation and provide the recommended testing accommodation without further inquiry*."

    - "*Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment. This is especially important for individuals with learning disabilities because face-to-face interaction is a critical component of an accurate*

*evaluation, diagnosis, and determination of appropriate testing*

*accommodations*."

52.     By email dated October 5, 2018, **Elisea Hewitson**, of Defendant NBME advised

that I "*must do the following*" before Defendant NBME could "*begin to review*" my request for

testing accommodations on the USMLE Step 3:

- "*Complete your registration for the USMLE Step 3 examination (for assistance with registration, contact FSMB at 817-868-4041, usmle@fsmb.org, or www.fsmb.org).   Please inform them that you are seeking test accommodations and have them place the appropriate HOLD on your scheduling permit*."

- "*If you received accommodations in medical school, please have the appropriate official at your medical school complete a USMLE Certification of Prior Test Accommodations (CPTA) form (available at [http://www.usmle.org/test-accommodations/forms.html](http://www.usmle.org/test-accommodations/forms.html))*."

- "*Once your registration shows as complete in our system with a HOLD on your scheduling permit and we have received your CPTA form (if applicable), we will review your request and submitted documentation. If necessary, we may contact you to request additional information*."

53.     By email dated May 24, 2019, **Elisea Hewitson**, of Defendant NBME notified me

of the following:

- "*This email is to confirm that your registration is now showing as complete and your request for test accommodations has been submitted for review.   If any additional documentation is required, you will be notified in writing*."

54.     By letter dated July 16, 2019, (53 days [35 business days] after my request was submitted for review) and signed by **Lucia McGeehan, Ph.D.**, of Defendant NBME notified me that my request for testing accommodations on the USMLE Step 3 had been denied due to the following reason(s):

- "*Your documentation does not demonstrate a substantial limitation in a major life activity as compared to most people or that the requested accommodations are an appropriate modification of your USMLE Step 3 test administration. Therefore, after a thorough review of all of your documentation, I must inform you that we are unable to provide you with the requested accommodations*."

- "*We will advise the Federation of State Medical Boards (FSMB) Assessment Services to process your exam application without test accommodations*."

  – Exhibit **S** (2019 NBME Denial of Testing Accommodations).

55.     Given my inability to obtain any gainful employment following my residency program termination in January 2018 – for failing to pass the USMLE Step 3 examination without accommodations – and since one of the NBME's reasons for denying my request for testing accommodations was, at least in part, that I had no history of being approved for the sought accommodations I requested from Defendant NBME for both my third and fourth attempts on the USMLE Step 3, I decided to enroll in yet another graduate program (Healthcare Management/Administration; 24-credit hours, graduate certificate), this time at the University of Denver (DU).

56.     I requested accommodations through DU's Disability Services Program and was approved for the requested accommodations. My approved accommodations included **extended time testing (50% more)** and Alternate Format Text (AFT) - conversion of textbooks, based

solely on the findings and recommendations for accommodations reported in my initial (2017)

Psychoeducational Evaluation report and the history I provided during a personal interview, both

which were submitted/provided for their consideration and review prior to them approving my

request. The approval of my requested accommodations was formally issued through a written

eligibility notification; a 2019-2020 Letter of Approved Accommodations (LOAA) by the

Disability Services Program at DU. – Exhibit **C**.

57.    On October 21, 2019, I sat for the USMLE Step 3 for my third time without

accommodations, which was once again followed by receipt of my third failing score report on

the USMLE Step 3. – *Exhibit AE* (October 2019 – USMLE Step 3 score report).

58.    I completed my year of graduate school education at the University of Denver in

June 2020 with a 4.0 GPA. I think it important to note that with official recognition of me as an

individual with the same relevant diagnosed disabilities I sought testing accommodations for by

the Defendant NBME for the USMLE Step 3; approval of the same requested testing

accommodations as I sought from Defendant NBME on the USMLE Step 3; and with the

necessary institutional support which I wish I had from Defendant NBME, as well as from my

former residency program and GME administration at WSUSOM; I was finally able to fully

perform in a way that evinced my actual and advanced intellectual abilities with the addition of

adequate and appropriate accommodations for my disabilities. – *Exhibit AB*.

59.    On or about March 30, 2021, I submitted an official request to the NBME for

testing accommodations on my fourth attempt on the USMLE Step 3 via an email from my

attorney. I provided the NBME with all required and requested documentation, which included a

completed USMLE Request for Test Accommodations form; my most recent 2020

Neuropsychological Evaluation report including recommendation for testing accommodations;

personal statement; letter of support from my attorney; and an excessive amount of relevant accompanying documentation. The accompanying documentation covered dates ranging from years **1994–2020**, including but not limited to the following: – Exhibit **T** (2021 USMLE Request for Testing Accommodations).

A.  High stakes standardized examination attempts/score reports:

    a.  6 combined SAT/ACT attempts. – Exhibits **E** and **F**.

    b.  2 MCAT attempts. – Exhibit **G**.

    c.  1 GRE attempt. – Exhibit **G**.

    d.  1 USMLE Step 1 attempt. – Exhibit **H**.

    e.  2 USMLE Step 2 CK attempts. – Exhibits **I** and **K**.

    f.  1 USMLE Step 2 CS attempt. – Exhibit **J**.

    g.  3 USMLE Step 3 attempts. – *Exhibits AC*, *AD*, and *AE*.

B.  Academic transcripts:

    a.  University of Colorado (2006–2008). – Exhibit **AA**.

    b.  Ross University School of Medicine (2009–2014). – Exhibit **L**.

    c.  University of Denver (2019–2020). – *Exhibit AB*.

C.  Medical Student Performance Evaluation (MSPE). – Exhibit **M**.

D.  University of Denver, 2019-2020 Letter of Approved Accommodations (LOAA).

    – Exhibit **C**.

60.    This documentation demonstrated that a qualified professional evaluated the following prior to my 2021 request for testing accommodations from Defendant NBME on the USMLE Step 3:

A. My relevant documentation from assessments dating from preschool to 2019, which included all examination reports from 1994 – 2019 that I submitted with my 2021 request for testing accommodations by Defendant NBME on the USMLE Step 3. Please note once again the content under the following section headers in Exhibit **D**:

- **What Kind Of Documentation Is Sufficient To Support A Request For Testing Accommodations?**

  - "***Qualified Professionals.*** *Testing entities should defer to documentation from a qualified professional who has made an individualized assessment of the candidate that supports the need for the requested testing accommodations. Qualified professionals are licensed or otherwise properly credentialed and possess expertise in the disability for which modifications or accommodations are sought. Candidates who submit documentation (such as reports, evaluations, or letters) that is based on careful consideration of the candidate by a qualified professional should not be required by testing entities to submit additional documentation. A testing entity should generally accept such documentation and provide the recommended testing accommodation without further inquiry*."

    - "*Reports from qualified professionals who have evaluated the candidate should take precedence over reports from testing entity reviewers who have never conducted the requisite assessment of the candidate for diagnosis and treatment. This is especially important for individuals with learning disabilities because face-*

*to-face interaction is a critical component of an accurate*

*evaluation, diagnosis, and determination of appropriate testing*

*accommodations*."

61.     By letter dated June 28, 2021, (**90 days** [**61 business days**] after my request was

submitted for review) and ***unsigned*** by **Disability Services** of Defendant NBME notified me that

my request for testing accommodations on the USMLE Step 3 had been denied due to the

following reason(s): – Exhibit **U** (2021 NBME Denial of Testing Accommodations).

- "*We have thoroughly reviewed the documentation provided in support of your*

   *request for test accommodations for the United States Medical Licensing*

   *Examination (USMLE) Step 3. We conducted an individualized review of your*

   *request in accordance with the guidelines set forth in the amended Americans*

   *with Disabilities Act (ADA)*."

- "*Your documentation does not demonstrate a substantial limitation in a major life*

   *activity as compared to most people or that the requested accommodations are an*

   *appropriate modification of your USMLE Step 3 test administration. Therefore,*

   *after a thorough review of all of your documentation, I must inform you that we*

   *are unable to provide you with the requested accommodations*."

62.     It is difficult for me to express in words the cumulative negative impact that not

being identified and diagnosed with my relevant disabilities until reaching adulthood has had on

my psychological, emotional, and financial well-being, including and especially on my feelings

of self-worth and self-doubt. In addition, the negative consequences that have been added

following my initial identification and diagnosis of SLD, with Impairment in Reading (deficits in

reading fluency/rate and reading comprehension), have left me frightened, extremely hesitant,

and discouraged about how I am supposed to approach similar issues in the future, not to mention the very difficult remaining years of my life that have been caused by it all.

63.     These negative impacts have also taken a toll on my relationships with close friends and family, as well as with academic and professional peers. My feelings of shame associated with being terminated from my residency program and from constantly having my progression delayed over such an extended period of time has been very difficult, especially while most everyone else I know keeps progressing as expected through life.

64.     Lastly, since I was terminated from my residency program in January 2018 for failing to pass the USMLE Step 3, I still remain involuntarily unemployed largely as a consequence of my now three failed attempts on the USMLE Step 3 without accommodations. Therefore, I have been also unable to make any significant repayments on my excessive and still increasing amount of student loan debt. On the submission date of this declaration my current amount of federal student loan debt is >$500,000. – Exhibits **V** (Subsidized loan debt.) and **W** (Unsubsidized loan debt.).

65.     Again, the United States Medical Licensing Examination (USMLE) Step 3 is the only remaining examination in the three step, four examination, series (Steps 1, 2CK, 2CS, and 3) that I must pass in order to complete the examination requirements for obtaining U.S. medical licensure.

66.     I am currently scheduled for my fourth attempt on the USMLE Step 3 for test dates October 21 and 25, 2021, without the requested testing accommodations denied by Defendant NBME on this scheduled attempt. Of note, under standardized USMLE Step 3 conditions, the USMLE is a two-day examination and must be scheduled as such (i.e., Test Days 1 & 2). For example, my upcoming test dates for my fourth attempt on the USMLE Step 3

without accommodations are: USMLE Step 3 Test Day #1 – 10/21/2021; USMLE Step 3 Test Day #2 – 10/25/2020.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of September 2021.

s/ Jason M. Wright

Jason M. Wright